**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AXIOM PRODUCT ADMINISTRATION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20-cv-01333-MTS |
| | ) | |
| DAN O'BRIEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Before the Court are Defendant Dan O'Brien, DMO Auto Acquisitions LLC, DMO North Hampton LLC, DMO Claremont LLC, DMO Norwood LLC, DMO Chelmsford LLC, and DMO Hanover LLC's (collectively "Defendants") Motion for Summary Judgment, Doc. [122], and Plaintiff Axiom Product Administration's Motion for Partial Summary Judgment, Doc. [139].  For the reasons discussed herein, the Court will deny Defendants' Motion for Summary Judgment and grant Plaintiff's Motion for Partial Summary Judgment.

**Legal Standard**

Under Federal Rule of Civil Procedure 56(a), "a court must grant a motion for summary judgment if the moving party shows that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law."[1] *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  When parties file cross-motions for summary judgment it "does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits."  *Wermager v. Cormorant Twp. Bd.*, 716 F.2d

---

[1] "The usual Rule 56 standard applies to cross-motions for summary judgment."  *DaPron v. Spire, Inc. Ret. Plans Comm.*, 377 F. Supp. 3d 946, 957 (E.D. Mo. 2019), *aff'd sub nom. DaPron v. Spire Mo., Inc.*, 963 F.3d 836 (8th Cir. 2020) (quoting *Int'l Brotherhood of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002)); *accord HM Compounding Servs., LLC v. Express Scripts, Inc.*, 349 F. Supp. 3d 781, 787 (E.D. Mo. 2018).

1211, 1214 (8th Cir. 1983).  "The movant bears the initial responsibility of informing the district court of the basis for its motion and must identify the portions of the record that it believes demonstrate the absence of a genuine issue of material fact."  *Bedford*, 880 F.3d at 996 (citing *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011) (en banc)); *accord* Fed. R. Civ. P. 56(c)(1).

When the movant would bear the burden of proof on a claim at trial, the movant "must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing."  10A C. Wright, A. Miller, & M. Kane, Fed. Prac. & Proc. Civ. § 2727.1 (4th ed.); *accord, e.g.*, *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (explaining that when the movant carries the burden of proof at trial, the movant "must 'establish beyond peradventure *all* of the essential elements of the claim or defense'" (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986))).  When the movant would *not* bear the burden of proof on a claim at trial, the movant may "satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show[2] that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial."  *Bedford*, 880 F.3d at 996.

Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own

---

[2] "A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000); *accord Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (noting that a moving party must "point to materials on file which demonstrate that a party will not be able to meet that burden").

conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). If the nonmoving party fails to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof, the moving party is "entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323. When reviewing cross-motions for summary judgment where the parties' version of events differ, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007); *accord Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023).

## Background

Plaintiff Axiom Product Administration ("Axiom") is a Missouri corporation that specializes in providing nationwide finance and insurance ("F&I") products tailored toward automobiles. Doc. [143] ¶ 1. Axiom contracts with dealers to promote and sell F&I products in tandem with automobile sales. *Id.* Defendant Dan O'Brien ("O'Brien") is the sole member and owner of several car dealerships throughout New Hampshire and Massachusetts that are actively engaged in the retail sale of automobiles.[3] *Id.* ¶ 2. O'Brien is also the owner of Awesome Warranties Reinsurance Company, Ltd. ("Awesome Warranties"), which serves as the reinsurer for the F&I contracts sold to customers. *Id.* ¶ 41.[4]

On December 13, 2019, Axiom entered into a Dealer Capital Advance Agreement (the "DCAA") with the Defendants and Glenn Schmitt ("LENDER" or "Lender")—who is not a party

---

[3] These dealerships include Defendants DMO Auto Acquisitions LLC, DMO North Hampton LLC, DMO Claremont LLC, DMO Norwood LLC, DMO Chelmsford LLC, and DMO Hanover LLC. Doc. [87] ¶ 3; Doc. [89] ¶ 1.
[4] Awesome Warranties is not a party to this action, nor is it a party to the Dealer Capital Advance Agreement.

to this action.[5]  *Id.* ¶ 5.  As part of the DCAA, Axiom, labeled throughout the DCAA as "COMPANY," was to "arrange a capital advance" from the Lender to Defendants, and to "act as processor of payments" and to "provide and maintain record of the payments" from the Defendants to the Lender.  *Id.* ¶ 18.  In turn, the Defendants agreed to make repayments, or remits, to the Lender, through Axiom, until the capital advance was paid in full.  *Id.* ¶ 27.  As part of the DCAA, Defendants agreed to exclusively offer Axiom's products and to refrain from negotiating with entities other than Axiom.  *Id.* ¶ 23.  The DCAA required this exclusivity to continue until December 31, 2023, or two years following the date the capital advance is fully repaid, whichever is later.  *Id.* ¶ 22.  Later, in April 2020, Defendants and Axion agreed to an Addendum whereby Defendants' payments for April and May 2020 would be deferred due to the inception of the pandemic.  *Id.* ¶ 26.

Prior to the DCAA, Defendants and Axiom had entered into at least six separate agreements.  *Id.* ¶ 11.  In 2017, Defendants and Axiom entered into a Dealer Agreement, Doc. [87-2] (the "Dealer Agreement"),[6] which memorialized Defendants' intent to offer Axiom's F&I products to its customers.  Doc. [143] ¶ 12.  The Dealer Agreement required Axiom to "[r]egister, maintain, and administer each Product Agreement" for each Product sold by the Defendants, as well as to "[o]btain, negotiate and maintain any underwriting agreements and contractual liability insurance policies ('CLIPs') related to Product claims necessary to ensure regulatory compliance."  Doc. [87-2] at 6.

However, it is undisputed that a separate third-party, Fortegra, which is not a party to this action, served as Axiom's underwriter.  Doc. [143] ¶ 39.  Fortegra issued CLIPs that insured the

---

[5] Lender Glen Schmitt and Defendants entered into a Settlement Agreement and Mutual Release, Doc. [123-12], which released Defendants of all claims potentially initiated by Lender.  Doc. [130] ¶ 21.
[6] Axiom and DMO Auto Acquisitions LLC were parties to the original Dealer Agreement, and later Axiom entered into an additional Dealer Agreement with DMO North Hampton LLC.  *See* Doc. [143] ¶¶ 4, 15.

risk of products sold to customers. *Id.* Fortegra also ceded premiums and claims to Awesome Warranties.[7] *Id.* ¶ 43. On March 1, 2019, Awesome Warranties and Fortegra entered into a Quota Share Reinsurance Agreement ("the Reinsurance Agreement").[8] *Id.* ¶¶ 47-49. The Reinsurance Agreement lists the obligations associated with ceding premiums, in reports identified as "cession statements."[9] *Id.* Article 7 of the Reinsurance Agreement requires Fortegra to provide reports to Awesome Warranties containing information on net premiums and ceding fees, among other things. *Id.* ¶ 54. In other words, Fortegra was responsible for preparing monthly "cession statements" reflecting transactions between itself and Awesome Warranties. *Id.* ¶ 55. Then, pursuant to Article 7 of the Reinsurance Agreement, Fortegra would send the statements to Axiom, which would then forward them to Awesome Warranties. *Id.* ¶ 57. Axiom would send the cession statements to O'Brien, but the parties dispute whether they were sent to O'Brien in his capacity as owner of Awesome Warranties or as general reporting from Axiom to the Dealership Defendants pursuant to Axiom's alleged reporting requirement under the DCAA and Dealer Agreement. *Id.* ¶ 58.

It was also around this time, in early 2019, that O'Brien began to observe discrepancies and omissions in the monthly reporting provided by Fortegra, through Axiom. *Id.* ¶ 67. As an example, a cession statement from December 2019 showed an earned premium total of $1,405,939.78, whereas the next statement from January 2020 showed a reduction in the earned premium to $338,671.63. *Id.* ¶ 77. Defendants notified Coffeen Management Company

---

[7] Fortegra "ceded," or transferred, the policies, certificates, and other insurance items within the F&I contracts administered by Axiom, through Defendants, to Awesome Warranties, as reinsurer. Doc. [140-9] at 1.

[8] The Quota Share Reinsurance Agreement was officially entered into between Awesome Warranties and Lyndon Southern Insurance Company, Insurance Company of the South, and Response Indemnity Company of California (collectively, "Fortegra"). *See* Doc. [143] ¶ 47; *see also* Doc. [140-9]. Neither Defendants, nor Axiom is a party to the Reinsurance Agreement. Doc. [143] ¶¶ 48-49.

[9] These statements summarized the contracts conveyed from Fortegra to Awesome Warranties, including the amount of F&I contracts sold, the amount of money collected and allocated for fees, insurance reserves, and repayment of the capital advance. Doc. [89] ¶ 24.

("Coffeen")[10] of the discrepancies, and Coffeen promised to look into the matter further. *Id.* ¶¶ 81-82. Later, in July 2020, Defendants engaged Vincent Mark Genova ("Mark Genova") to conduct an audit of the cession statements. *Id.* ¶ 92. Mark Genova's audit allegedly discovered that 67 contracts out of 37,000 appeared on Fortegra's cession statements, but not Axiom's commission statements; however, this number was "negligible" and an "acceptable difference." *Id.* ¶¶ 94-95.

Also, around July 2020, Axiom became aware that Defendants had contracted with DOWC Administrative Services, an F&I supplier, in violation of the exclusivity provision of the DCAA. *Id.* ¶¶ 33-36. It would later be discovered that Defendants had also engaged in conversations with other F&I entities. Specifically, an email from Jason Gannon[11] included a series of "Producer Agreements" entered into between several of O'Brien's dealerships and Strategic Administration Group, an entity also engaged in the sale of F&I products. Doc. [129-7]. As a result of the Defendants' alleged breach of the exclusivity clause in July 2020, Axiom sent a letter to Defendants demanding compliance with the exclusivity provision or payment of $1,620,000, the amount of vehicles sold multiplied by the liquidated damages amount. Doc. [87-4] Defendants did not comply.

Axiom then brought suit against Defendants alleging four counts of breach of contract and seeking: (1) injunctive relief, (2) specific performance, (3) damages, and (4) attorneys' fees. In response, Defendants filed a counterclaim, Doc. [89] at 29,[12] alleging breach of contract for failure to properly report on the "Contract Program" and requesting an equitable accounting. *Id.* at 35-

---

[10] Coffeen is referred to as the "Agent" within the DCAA and serves as the manager and servicer of Defendants' account. Doc. [87-1] at 1.

[11] Jason Gannon is an employee of F&I Guys, an entity that, the parties dispute, had allegedly served as an agent for Defendants. Doc. [143] ¶ 106.

[12] All citations to a specific page number will refer to the page number utilized within the original document, unless clarified otherwise.

38; Doc. [87-1] at Ex. D.  Now, the parties have filed competing Motions for Summary Judgment.

Defendants seek summary judgment on all of Plaintiff's claims.  Plaintiff seeks summary judgment

on Counts III and IV of its Amended Complaint, as well as summary judgment on Defendants'

Counterclaims.

**Discussion**

I.    **Axiom is entitled to Summary Judgment on Count III of its Amended Complaint seeking damages for breach of contract because it is undisputed that Defendants breached the DCAA in July 2020 when it entered into a contract with DOWC and stopped exclusively offering Axiom's products.**

Defendants do not deny breaching the DCAA in July 2020, when they entered into a

contract with DOWC.  *See* Doc. [143] ¶ 35.  However, both parties contend the other breached the

DCAA prior to that point.  Axiom argues that, even if it had breached the DCAA prior to July

2020, Defendants were the first to breach the DCAA when they participated in conversations with

other F&I entities, in violation of the exclusivity provision—Section IV(G)—of the DCAA.[13]

Doc. [141] at 7-8.  Conversely, Defendants argue Axiom breached the DCAA first when it failed

to identify and correct the miscalculations within the cession statements provided to O'Brien.[14]

Doc. [144] at 12.

Since Axiom is seeking summary judgment on its own claims for damages, Axiom is the

moving party.  In seeking summary judgment for liability on Counts III and IV of its Amended

Complaint, Axiom is the moving party with the burden of proof at trial.  For these claims, Axiom

must establish there is no genuine dispute of material fact, and it is entitled to judgment as a matter

---

[13] Axiom also argues when Defendants entered into the DCAA in 2019, they waived all prior objections to inaccurate reporting, removing the possibility that Axiom was the first to breach.  However, because Defendants communicated their complaints to Coffeen and engaged Mark Genova to conduct an audit, the right was not renounced.  *Boswell v. Panera Bread Co.*, 4:14-cv-01833-AGF, 2016 WL 1161573, at *14 (E.D. Mo. Mar. 24, 2016), *aff'd*, 879 F.3d 296 (8th Cir. 2018) ("To rise to the level of a waiver, the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of [the] conduct is possible" (quoting *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 409 (Mo. Ct. App. 1996))).

[14] For reasons that will be discussed in Part II, Defendants' argument that Axiom breached the DCAA first fails.

7

of law.  For the reasons discussed herein, the Court will grant Axiom's Motion because it is undisputed Defendants breached the DCAA in July 2020.

Section IV(G) of the DCAA requires the Defendants to exclusively offer Axiom products until "(i) December 31, 2023; or (ii) two years, 24 months following the date that the capital advance is fully repaid[.]" Doc. [87-1] at 4.  Section IV(G) also requires the Defendants to "solicit, promote, sell, or offer" Axiom's products only and to refrain from participating in "any discussions or negotiations" with entities other than Axiom regarding the sale of F&I products.  *Id.*

Axiom argues that Defendants breached Section IV(G) when they communicated with Strategic Administration Group, as shown in an email from Jason Gannon, dated January 14, 2020.  This email contains "Producer Agreements" seemingly between several of O'Brien's dealerships and Strategic Administration Group.[15]  While these Agreements show Defendants engaged in communication with entities other than Axiom, Section IV(G) also states that Defendants are "not in breach" of exclusivity so long as "100%" of the products offered by the Defendants are "issued" by Axiom.  *Id.*  Axiom has failed to show Defendants stopped exclusively offering its products at this time, and Defendant Dan O'Brien reiterated the same in his deposition:

> Q.  When did you first start breaching [the DCAA]?
> …
> A.  I think we stopped conforming with it after Axiom breached in July of 2019 – or 2020, sorry.
> Q.  So the first time you stopped selling exclusively Axiom products was July of 2020?
> A.  Yeah, when we sent a letter.

Doc. [143-4] at 46; *see also id.* at 235 ("A.  No.  I just know that we did not sell products through DOWC any time before July.").  Thus, Defendants communication with Strategic Administration Group was not a breach.

---

[15] The Producer Agreements include several of O'Brien's stores and list DMO Acquisitions LLC, DMO Norwood LLC, DMO North Hampton LLC, and DMO Claremont LLC as "Producers."  Doc. [129-7].

8

However, Defendants readily admit they breached the DCAA in July 2020 when they began selling F&I products from DOWC in violation of the DCAA's exclusivity obligation.  Doc. [143] ¶¶ 33-36.  Therefore, it is undisputed that Defendants breached the DCAA in July 2020, and absent Defendants presenting an earlier instance of breach by Axiom, Axiom is entitled to summary judgment on liability for Count III—seeking damages for breach of contract—of its Amended Complaint.

**II.     Axiom is entitled to Summary Judgment on Defendants' Counterclaims because under the plain language of Exhibit D of the DCAA, the Dealer Agreement, and the Reinsurance Agreement, Axiom did not have the duty to correct cession statements before providing them to Defendant O'Brien.**

For Defendants' Counterclaims, Axiom is the moving party without the burden of proof for the claims at trial.  As such, Axiom must either negate an essential element of the Defendants' Counterclaims, or Axiom must show that Defendants cannot meet their burden of proof for the claims at trial.  Here, the plain language of Exhibit D of the DCAA, requiring Axiom to "maintain and administer the Contract Program," does not obligate Axiom to correct the cession statements it received from Fortegra prior to transferring the statements to Defendant O'Brien.  The plain language of the Dealer Agreement and the Reinsurance Agreement also establish that Axiom is under no obligation to correct the cession statements.  Therefore, because Axiom has negated Defendants' Counterclaims alleging breach, the Court will grant Axiom summary judgment on Defendants' Counterclaims.  Each will be discussed in turn.

**a.  The plain language of Exhibit D of the DCAA listing Axiom's obligation "to maintain and administer the Contract Program" does not include the duty to correct the cession statements.**

Although Defendants admit they breached the DCAA's exclusivity provision in July 2020, Count I of Defendants Counterclaim alleges that Axiom breached the DCAA first, when it failed to identify and correct miscalculations in the cession statements provided by Axiom to O'Brien.

*See* Doc. [89] ¶ 36.  However, after reviewing the plain language of the DCAA, Axiom was under no such duty to correct the cession statements.

Under Missouri law, "if a contract is clear and unambiguous, its meaning must be derived from the contract's plain language."  *MWG Enters., LLC v. ETS Wound Care, LLC*, 586 F. Supp. 3d 946, 961 (E.D. Mo. 2022).  "Whether a contract is ambiguous is a legal question determined by looking at the contract as a whole and standing alone."  *Id.*  When interpreting a contract, the goal is to "ascertain the intention of the parties" and "give effect to that intent."  *Portell v. AmeriCold Logistics*, 571 F.3d 822, 824 (8th Cir. 2009) (quoting *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003)).  Terms must be afforded their "plain, ordinary, and usual meaning," unless the terms are reasonably subject to more than one meaning. *Id.*  Contract construction that "gives reasonable meaning to each term and harmonizes all provisions is preferred" over those that render provisions "without function or sense."  *See Neighbors Credit Union v. Integon Nat'l Ins. Co.*, 4:21-cv-1477-RWS, 2022 WL 16649506, at *3 (E.D. Mo. 2022) (quoting *State ex rel. Riverside Pipeline Co., L.P. v. Pub. Serv. Comm'n*, 215 S.W.3d 76, 84 (Mo. banc 2007)).  Additionally, the agreement's construction shall be interpreted to avoid rendering other terms "meaningless."  *Portell*, 571 F.3d at 824.

Exhibit D of the DCAA lists the "Party Responsibilities" of the Defendants and Axiom. Axiom's responsibilities include "to maintain and administer the Contract Program for Dealer and Lender."  Doc. [87-1] at Ex. D.  The phrase "Contract Program" is undefined within the DCAA. When interpreting the meaning of a contract, the meaning of terms, and whether they are ambiguous, may be uncovered by "looking at the contract as a whole."  *MWG Enters., LLC*, 586 F. Supp. 3d at 961.  The term "contract" is used in various places within the DCAA, however, two such instances are most instructive.  First, Section IV(D)(1) requires Defendants to "produce sales" of "100 VSC *contracts*, 75 GAP *contracts*, and a combination of 105 ancillary and Pre-load

10

Protection *contracts*." *See* Doc. [87-1] at 3 (emphasis added).  Then, Section IV(D)(2)(b) provides that Axiom may seek reimbursement for the month in which Defendants failed "to produce the minimum number of *program Contracts*." *Id.* (emphasis added).  These uses instruct that the phrase "Contract Program" is intended to encompass Defendants' obligation to sell a specific amount of contracts to facilitate repayment of the capital advance.

Examining the actual words within Exhibit D of the DCAA can help uncover the parties' true intention of the phrase "to maintain and administer" as it relates to the Contract Program.  *See Carpenters Pension Tr. Fund of Kansas City v. Lankford Enters., Inc.*, 570 F. Supp. 3d 731, 737 (W.D. Mo. Nov. 5, 2021) ("Recourse to the ordinary, dictionary definition of words is not only reasonable, but may be necessary." (quoting *Cent. States, Se. & Sw. Areas Pension Fund. v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1350 (8th Cir. 1990))).  Unless the words to "maintain" or "administer" attach the obligation to correct the cession statements provided to O'Brien, Axiom was not required to do so.  "Maintain" has several different meanings, including "to keep in an existing state," to "preserve from failure or decline; to sustain against opposition," and "to continue" and "to support or provide for."  *Maintain*, Merriam-Webster, (last visited December 6, 2023), https://www.merriam-webster.com/dictionary/maintain.  "Administer" means "to manage or supervise the execution, use or conduct of; to provide or apply," as well as "to manage affairs." *Administer*, Merriam-Webster, (last visited December 6, 2023), https://www.merriam-webster.com/dictionary/administer.  Even if "Contract Program" would somehow include the obligation to provide cession statements, which the DCAA as a whole does not detail, the ordinary meaning of "maintain" and "administer" shows that Axiom's obligation was to preserve or supervise the Contract Program, not to correct any cession statements resulting from the contracts.

11

Therefore, the plain language of Exhibit D of the DCAA requires Axiom to maintain and keep record of the contracts involved within the sale of Axiom's F&I products, not to correct the cession statements provided by Fortegra.

      b.  **The plain language of the Dealer Agreement, which is incorporated into the DCAA by reference, only requires Axiom to transfer the cession statements to O'Brien.**

The plain language of the Dealer Agreement clarifies that Axiom was only obligated to transfer the cession statements to O'Brien.  Although the Dealer Agreement is a document separate from the DCAA, under Missouri law, "matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba." *Bridgecrest Acceptance Corp. v. Donaldson*, 648 S.W.3d 745, 752 (Mo. banc 2022) (quoting *Dunn Indus. Grp., Inc.*, 112 S.W.3d at 435 n.5).  This incorporation rings true so long as "the intent to incorporate is clear and the incorporating contract makes a plain, explicit reference to and adequately identifies the incorporating document." *Bridgecrest Acceptance Corp.*, 648 S.W.3d at 752.  Here, "DEALER AGREEMENT" is a defined term within the DCAA, *see* Doc. [87-1] at 1, and Section IX of the DCAA states "[a]ll other provisions of the DEALER AGREEMENT remain in full force and effect and apply in full to this Agreement."  Doc. [87-1] at 5.  Therefore, the Dealer Agreement's terms are clearly incorporated by reference into the DCAA.

Under the Dealer Agreement, Axiom is required to "obtain, negotiate and maintain any underwriting agreements[16] and contractual liability insurance policies ('CLIPs') related to Product claims."  Doc. [87-2] at 6.  At first blush, the inclusion of the phrase "related to Product claims" seems to narrow Axiom's responsibilities to keep records of any and all claims resulting from the sale of the F&I products.  Nonetheless, examining the "ordinary, dictionary definition" of the

---

[16] The parties do not dispute that it is Fortegra's responsibility to create the cession statements and to serve as underwriter for Axiom.

words utilized within the agreement again provides clarity.  *See Carpenters Pension Tr. Fund of Kansas City*, 570 F. Supp. 3d at 737 (quoting *Cent. States, Se. & Sw. Areas Pension Fund.*, 919 F.2d at 1350).

The Dealer Agreement utilizes the words "maintain," "obtain," and "negotiate."  Doc. [87-2] at 6.  "Maintain" as referenced in Part I(c) means to keep or preserve.  "Obtain" means "to gain or attain usually by planned action or effort" or "to be generally recognized or established." *Obtain*, Merriam-Webster, (last visited December 6, 2023), https://www.merriam-webster.com/dictionary/obtain.  Finally, "negotiate" means "to confer with another so as to arrive at the settlement of some matter," and also, "to deal with; to arrange for," and "to transfer to another by delivery." *Negotiate*, Merriam-Webster, (last visited December 6, 2023), https://www.merriam-webster.com/dictionary/negotiate.  Applying the plain, ordinary, and usual meaning of the words, it is clear Axiom is required to keep and make record of the underwriting agreements and CLIPs associated with each purchase.  Again, "cession statements" is not expressly mentioned within the Dealer Agreement, but even if it was, no term seems to indicate a duty to correct the cession statements.  Furthermore, the parties' use of the word "negotiate" within the Dealer Agreement directly correlates with the actions undertaken by Axiom.  "Negotiate" means "to transfer to another."  Axiom, by the plain language of the Agreement, was obligated to *transfer* the cession statements to O'Brien, nothing more, which is exactly what Axiom had been doing.

The plain language of the Dealer Agreement requires that Axiom only maintain and transfer the cession statements to O'Brien.

   **c.   The plain language of the Reinsurance Agreement requires Fortegra to correct any errors in the cession statements.**

Finally, it must be determined whether the obligation to correct the cession statements is delegated to Axiom elsewhere, as Defendants suggest, like the Reinsurance Agreement.  It is

important to note, neither Defendants nor Axiom is a party to the Reinsurance Agreement. Therefore, neither party has standing to enforce the Reinsurance Agreement. *See Burnett v. Nat'l Assoc. of Realtors*, 75 F.4th 975, 982-83 (8th Cir. 2023) (explaining it is a sound contract principle that "[o]nly parties to a contract" have "standing to enforce" the terms of the contract (quoting *Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 153 (Mo. banc 2007))).  However, even if the parties had standing, no obligation regarding the cession statements is imposed on Axiom within the Reinsurance Agreement.

Again, it is Defendants' position that while Axiom was not obligated to create the cession statements, a duty arose when Axiom failed to identify and correct the incorrect statements.  The Reinsurance Agreement, involving Fortegra and Awesome Warranties, discusses the obligations surrounding the cession statements.   While it is not apparent the Reinsurance Agreement is incorporated within the DCAA, assuming *arguendo* it is, Axiom is still under no obligation to correct the statements.  Article 7 of the Reinsurance Agreement states Fortegra "shall furnish" a cession statement containing certain information at the close of each month.  Doc. [140-9] at 3. This is undisputed by the parties.  Article 11 of the Reinsurance Agreement assigns the duty to fix errors and omissions and states:

> Inadvertent errors or omissions by [Fortegra] in any manner reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery by [Fortegra].

*Id.* at 5.

Thus, the plain language of the Reinsurance Agreement obligates Fortegra to reconcile any errors in the cession statement, not Axiom.[17]  Axiom, as the party moving for summary judgment

---

[17] Defendants also argue that an Axiom employee would review the cession statements for accuracy.  *See* Doc. [144] at 11; *see also* Doc. [143-3] at 21 ("Q. So as part of your job duties, is one of those [duties] to look at the cession statements and make sure the numbers match up or align with Axiom's own accounting?  A. Correct.").  But, similar to the Reinsurance Agreement requiring Fortegra to correct cession statement errors, the employee testified that she would notify Fortegra of any inaccuracy, which would then resolve it.  *See* Doc. [140-11] at 7 ("Q. And you said

without the burden of proof at trial, has shown that the plain language of the DCAA, the Dealer Agreement, and the Reinsurance Agreement creates no discernable duty to correct the cession statements provided to O'Brien, as by result, is entitled to summary judgment on Defendants' Counterclaims.

\*     \*     \*     \*

Axiom is entitled to summary judgment on Count III of its Amended Complaint because it is undisputed that Defendants breached the exclusivity obligation of the DCAA when they contracted with and began selling DOWC's F&I products in July 2020.  Axiom is also entitled to summary judgment on Defendants' Counterclaims.  Axiom is the moving party without the burden of proof at trial for Defendants' Counterclaims.  As a result, to succeed on its Motion for Summary Judgment, Axiom must show that Defendants cannot meet their burden of proof for their breach of contract claim at trial or that Defendants cannot establish an essential element of their claim for breach.  *See Bedford*, 880 F.3d at 996.  Here, the plain language of Exhibit D of the DCAA requires that Axiom preserve the records related to the sale of Axiom's F&I products, but Exhibit D does not obligate Axiom to correct the cession statements.  Additionally, the plain language of the Dealer Agreement and Reinsurance Agreement reinforces that Axiom was only required to transfer the cession statements to O'Brien, and instead, Fortegra was required to correct the cession statements.  Therefore, in addition to summary judgment on Count III of its Amended Complaint, Axiom is also entitled to summary judgment on Defendants' Counterclaims because Axiom has properly negated Defendants' Counterclaims for breach of contract and equitable accounting.[18]

---

typically, once you did contact Fortegra, [the discrepancies] would be reconciled or resolved in some way?   A. Correct.").

[18] Count II of Defendants' Counterclaim seeks an equitable accounting to determine the extent of Axiom's breach. *See* Doc. [89] ¶ 43.  Because Axiom has negated Defendants' claim for breach, an equitable accounting is unnecessary and summary judgment for Count II of Defendants' Counterclaim is also appropriate.

**III.     Axiom has the right to enforce the exclusivity provision under the DCAA because the plain language of Sections IV(G), (H), and (D) of the DCAA, as well as the Dealer Agreement, entitles Axiom to demand payment in the event of breach by Defendants and receive payment in the form of liquidated damages.**

Although Defendants breached the DCAA in July 2020, Defendants contend, in their own Motion for Summary Judgment, that Axiom does not have the right to enforce the exclusivity provision—Section IV(G), which implicates Section IV(H)—or the Minimum Sales Requirement—Section IV(D)—of the DCAA.  *See* Doc. [122] ¶¶ 6-7.  Instead, Defendants believe only the Lender, Glen Schmitt, has the right to enforce the exclusivity obligation of the DCAA.[19]

As the moving party without the burden of proof for the claims in the Amended Complaint, Defendants must either negate an essential element of Axiom's claim for damages from breach of the DCAA or show that Axiom cannot meet its burden of proof for damages at trial.  Here, Defendants cannot carry their burden because the plain language of Sections IV(G), (H), and (D) of the DCAA, and the Dealer Agreement, grant Axiom the right to demand and receive payment for Defendants' breach independent of the Lender.  Defendants have failed to sufficiently disqualify Axiom's claim of breach[20] and its right to both seek liquidated damages and enforce the DCAA.  Therefore, the Court will deny their Motion.

---

[19] Defendants also present two additional arguments. *First*, Defendants contend that Lender's release of the Defendants from liability associated with the DCAA prohibits Axiom from bringing suit.  However, Axiom was not a party to the Settlement Agreement and Mutual Release, Doc. [123-12].  *See E.E.O.C. v. Waffle House*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").  *Second*, Defendants believe Axiom is precluded from bringing suit because it is a "co-obligee" with the Lender, and according to Missouri law, Axiom cannot sue "unilaterally" in such instances.  Here, Axiom has rights independent of the Lender, as evidenced in Section IV(I) of the DCAA, entitling Axiom to "demand for payment, any and all of [Axiom's] costs, fees and expenses[.]"  *See* Doc. [87-1] at 4; *see also Culver v. Smith*, 82 Mo. App. 390, 395-96 (Mo. Ct. App. 1900) (elaborating the intention of the promisor controls—"if [the promise] moves from many persons jointly the promise of repayment is joint, but if from many persons, but from each severally, then it is several").

[20] Part I of this Order has already established that it is undisputed Defendants breached the DCAA.

a. **Axiom is entitled to enforce the DCAA because the plain language of Section IV(H) of the DCAA requires liquidated damages to be paid to Axiom following Defendants' breach of their obligation to exclusively sell Axiom's products.**

Section IV(G), as discussed in Part I(c), details Defendants' obligation to exclusively offer Axiom's products until December 31, 2023, or for two years after repayment of the capital advance. Section IV(H) then contemplates the penalty for a breach of the exclusivity obligation listed in Section IV(G). The plain language of Section IV(H) provides Axiom the right to enforce the DCAA and receive payment.

To determine whether Axiom has the right to enforce Sections IV(G) and IV(H) of the DCAA, the terms of the sections must be interpreted. *MWG Enters., LLC*, 586 F. Supp. 3d at 961. Defendants correctly point out that Section IV(H) states that payment of "Liquidated Damages," an amount equal to $75 for each vehicle retailed at several of O'Brien's dealerships, is Defendants' "sole liability and entire obligation." Doc. [87-1] at 4. Section IV(H) also states this obligation is the Lender's "exclusive remedy," which Defendants believe precludes Axiom from enforcing the DCAA and from any recovery. *Id.* However, in the first sentence of Section IV(H), Defendants are required to pay liquidated damages to Axiom. *See id.* ("If DEALER breaches its obligations under Section G ('Exclusivity'), such DEALER shall pay monthly to COMPANY an amount equal to seventy-five ($75.00) for each vehicle retailed[.]"). No such payment is required to be made to the Lender under Section IV(H). Missouri law requires the terms of a contract to be afforded their "plain and ordinary" meaning. *Portell*, 571 F.3d at 824. Here, Section IV(H)'s limitation that liquidated damages are Defendants' "sole liability and entire obligation" only serves to limit the Defendants' penalty for a breach of their exclusivity obligation to payment of liquidated damages. Doc. [87-1] at 4. Additionally, Section IV(H)'s mandate that liquidated damages are "LENDERS exclusive remedy" only serves to limit the remedy available to Glen Schmitt, not Axiom. To interpret otherwise would render the payment to Axiom, described in Section IV(H), "without

function or sense." *See Neighbors Credit Union*, 2022 WL 16649506, at *3 (quoting *State ex rel. Riverside Pipeline Co., L.P.*, 215 S.W.3d at 84).

Contrary to Defendants' belief that Axiom cannot enforce the DCAA or receive payment alone, the plain language of Sections IV(G) and (H) dictate that liquidated damages are to be paid to Axiom.  Therefore, Defendants have failed to establish they are entitled to summary judgment as it relates to Sections IV(G) and (H) of the DCAA.

> **b. Axiom is entitled to enforce the Minimum Sales Requirement—Section IV(D) of the DCAA—because the plain language of Section IV(D) grants Axiom the sole right to demand payment of liquidated damages.**

Section IV(D) of the DCAA requires Defendants to exclusively produce a minimum number of contracts for Axiom.  Should Defendants fail to do so, Axiom may, "in its sole discretion," require Defendants to "reimburse COMPANY/LENDER" for either (i) the entire unearned portion of the capital advance, or (ii) the amount of the capital advance payment owed for the calendar month in which Defendants failed to produce the minimum number of contracts required.  Doc. [87-1] at 3.  Defendants argue the phrase "reimburse COMPANY/LENDER" means Axiom is only allowed to request the money on behalf of the Lender.  However, the plain language of Section IV(D) grants Axiom the right to demand payment "in its sole discretion" following Defendants' failure to meet its obligations of exclusivity.   In other words, the right to demand payment from the Defendants belongs to Axiom alone.

Thus, the plain language of Section IV(D) grants Axiom enforcement rights.  Because Axiom may demand payment "in its sole discretion," Defendants have failed to negate an essential element of Axiom's entitlement to damages for Defendants' breach of Section IV(D) of the DCAA.

     **c. Axiom has rights independent of the Lender because the plain language of the Dealer Agreement provides benefits to Axiom alone.**

The Dealer Agreement reinforces the fact that Axiom has independent rights enforceable under the DCAA.  The Dealer Agreement's Recitals specifically state: "WHEREAS the Dealer agrees to *remit to Axiom*, upon sale of each PRODUCT to a customer, an amount to be determined by Axiom."  Doc. [87-2] at 5 (emphasis added).  In sum, the Dealer Agreement expressly prescribes that Axiom, itself, is to receive payment from Defendants offering its F&I products to customers, and Axiom, alone, has the right to determine the payment amount.  To accept Defendants' proposed interpretation that Axiom may only request payment for the Lender would render the separate obligations to pay Axiom, and Axiom's discretion in determining the payment amount, meaningless and "without function or sense."  *Neighbors Credit Union*, 2022 WL 16649506, at *3 (quoting *Riverside Pipeline*, 215 S.W.3d at 84).  Defendants have failed to establish Axiom is not entitled to damages independent of the Lender because the plain language of Dealer Agreement grants Axiom not only the right to receive payments, but also the right to determine payment amounts.

*          *          *          *

Defendants are not entitled to summary judgment because Defendants have failed to present evidence negating an essential element of Counts I-III of the Amended Complaint.  The plain language of Section IV(H) of the DCAA grants Axiom the right to request and receive payment following Defendants' breach.  The plain language of Section IV(D) also provides Axiom the right to demand payment at its own discretion.  Then, the plain language of the Dealer Agreement reinforces these rights as Axiom is entitled to remits, determined at its discretion, independent of the Lender.  Therefore, because Defendants have failed to show that Axiom cannot

19

enforce the DCAA or receive liquidated damages, the Court will deny Defendants' Motion for Summary Judgment.

**IV.    Axiom is entitled to Summary Judgment on Count IV of its Amended Complaint because it is undisputed that the plain language of Section IV(I) of the DCAA grants Axiom the right to enforce the DCAA and entitles it to attorneys' fees.**

Finally, Section IV(I) of the DCAA reinforces Axiom's right to enforce the DCAA. Section IV(I) states, "DEALER will pay to COMPANY" following demand "all of COMPANY's costs, fees, and expenses including, without limitation, attorney and other legal fees, *arising under or related to the enforcement of its rights under this Agreement.*" Doc. [87-1] at 4 (emphasis added). The plain language of this section clearly grants Axiom enforcement rights following Defendants' breach of the DCAA. Therefore, Axiom is entitled to attorneys' fees, and other costs, resulting from Defendants' breach, and the Court will grant Axiom's Motion for Summary Judgment regarding liability for Count IV of its Amended Complaint.

**V.    Conclusion**

Summary judgment is only appropriate where the moving party shows there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. *Bedford*, 880 F.3d at 996 (citing Fed. R. Civ. P. 56(a)). In its Motion for Summary Judgment, Axiom, as the moving party, must establish there is no genuine dispute that Defendants breached the DCAA, but also must either negate an essential element of Defendants' Counterclaim for breach or establish Defendants cannot meet their burden of proof for breach at trial. Here, it is undisputed that Defendants breached the DCAA in July 2020 when they contracted with DOWC for the sale of F&I products, in violation of the exclusivity obligation of the DCAA. Axiom has also established that neither of the agreements to which it is a party—the DCAA or the Dealer Agreement—nor the Reinsurance Agreement obligates it to correct the cession statements provided to Defendant Dan O'Brien. Rather, the plain language of these Agreements obligates Axiom to transfer the

cession statements to O'Brien, at most.  The plain language of Section IV(I) then allows Axiom to demand payment for attorneys' fees and other costs related to enforcing its rights in the DCAA after Defendants' breach.  Therefore, Axiom is entitled to summary judgment for liability on Counts III and IV of its Amended Complaint and Defendants' Counterclaims.

Defendants also filed their own Motion for Summary Judgment on Counts I-III of the Amended Complaint.  As the party without the burden of proof at trial, Defendants must negate an essential element of the Counts for breach and damages or show Axiom cannot carry its burden at trial.  Here, Defendants have failed to sufficiently negate the claim that Axiom may enforce the DCAA and receive damages independent from the Lender.  The plain language of Sections IV(H) and IV(D) of the DCAA grants Axiom the right to demand and receive payment, in the form of liquidated damages, in the event of Defendants' breach.  The plain language of the Dealer Agreement also establishes that Axiom is to receive payment independent of the Lender.  Therefore, Defendants have not met their burden for summary judgment, and the Court will deny Defendants' Motion.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment, Doc. [139], is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, Doc. [122], is **DENIED**.

Dated this 2nd of January 2024.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE